May it please the Court, Stephen Beamer for the appellant, Officer Bryan McPherson. Also present, my associate Kerry Mitchell. I would like to reserve three minutes for rebuttal. I understand the Court has read the briefs extensively and I want to touch on the two major issues. The first issue I'd like to address is whether Officer McPherson is entitled to qualified immunity. The second issue is even if his conduct was excessive for the sake of argument, did his conduct violate clearly established constitutional rights at the time of the incident, which was July 24, 2005? Well, that's both one issue of whether he's entitled to qualified immunity. Ultimately, yes, Your Honor. I wanted to break those out for purposes of argument. Well, the first is whether there's a constitutional violation. Yes, Your Honor. The only guidance we have on that issue, based on my research, is the Draper case. I saw a lot of cases on that issue, including Diorle, for example. A couple of opinions I think that did. Bragus and Roy wrote on this subject. The closest, the Draper case factually, in my humble opinion, is the closest fact pattern that we have, utilizing the single implementation of a taser. No, that's true. That's the closest taser case. But there are lots of other cases about when you can use either deadly force or more than ordinary force. I guess tasers are in the middle. Yes, Your Honor. Lots of cases on when you can, when the police can gun down somebody with a taser or any other weapon when he's not threatening the police officer. Your Honor, relying on the San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose case, it's my understanding that the taser has been characterized or considered to be nonlethal or a less lethal use of force. Right. It's less lethal. It's an intermediate, like intermediate scrutiny. And that is the reason I've relied on the Draper case, which was to effectuate an arrest with a single implementation of a taser. In our fact pattern, and I know the appellee says we have disputed facts, but in our fact pattern before the court, including, in my opinion, McPherson's advance on the officer. Isn't that a disputed fact? Your Honor, you know, based on the opposition, at first glance it would. But if you read closely the factual facts before this court, I'd like to cite and recite the court to the plaintiff's deposition, page 127, lines 3 through 6. Question, did you move your feet in any way? Answer, I don't think so. Question, are you guessing or do you know that? Answer, I do not know that. I do not recall. So clearly we have no affirmative evidence on the part of the plaintiff. The only evidence before this court is proffered by Officer McPherson and two independent witnesses. Specifically, those witnesses. Well, what do we know about this taser, taser X26? The one thing we do know is. Is there anything in the record on that? The only thing we know is it's standard. They're tasers and they're tasers. Yes, Your Honor. And there's some tasers that can kill you. We don't know anything because the police department took back the taser and returned it, right? There was no evidence about the taser. The taser wasn't even before the court, right? The taser was not before the court. And why was that? Didn't the police department send it somewhere so that it wasn't available? No, there was an independent investigation. This is the city of Coronado Police Department. There was an independent investigation by the Chula Vista Police Department who came in under the circumstances, took custody of the taser, and then returned it. There is no evidence, affirmative or otherwise, regarding this taser before the court. The only thing we do know is the design of the taser from a lead standpoint. Clearly, this taser was designed to be implemented or used within a 15 to 20-foot distance, and that is the distance before the court between the officer and the plaintiff in this case. Let's talk about Graham v. Conner, which is the Supreme Court constitutional standard. Conner is an immediate threat. What was the immediate threat to the police officer here? I think we have to look at the fact pattern in context. We have a young man driving a vehicle in his underwear. We have his behavior. So a young man driving a vehicle in his underwear has that threat in the police? I think that's the first. When you are an officer, you are trained to look at your surroundings and circumstances. I think that is just one fact you must consider in the overall picture here is someone driving their vehicle in their underwear. What is their state of mind on those things crossing officers? Is there another factor, whether or not the person is mentally ill? Well, certainly when you are looking at this objectively, conclusions can be drawn by the officer, and that is based on the overall circumstances as I indicated. But clearly the officer does not know conclusively if this gentleman was mentally ill at the time of the traffic stop. So we have to take it back by fact. He testified he thought he might be mentally ill, right? I'm sorry? The police officer testified that he thought that the defendant might be, that McPherson might be mentally ill. Yes, Your Honor. The officer indicated that he was under the impression that the plaintiff was either mentally ill or under the influence of drugs. But if he thought he might be mentally ill, doesn't that mitigate the necessity for using force under our cases? My understanding is that when you do the analysis, you treat a mentally ill person the same as any other citizen under a traffic stop. I do think the officer considered that, and I think under the facts that is why the officer asked that the plaintiff remain in his vehicle. Given his violent conduct. But that's an issue in dispute too, right? Because McPherson says he didn't hear the officer telling him to do that. Well, again, you're looking at the officer's state of mind for purposes of deploying the taser. And the witnesses to this, which there are many independent witnesses, said they heard the officer indicate from a distance of 50 to 70 feet to stay in the vehicle. Clearly, the officer does not know whether or not the plaintiff heard him or not. The officer can only rely upon the objective facts, and that is he communicated stay in your vehicle loud enough in the officer's opinion for the plaintiff to hear those comments. It's really a question of who do you believe. Do you believe what McPherson says happened, or do you believe what the officer says happened? Well, I don't agree with the court in that analysis. I don't think we have disputed facts from the standpoint of why did the officer deploy his taser and whether or not his conduct was reasonable. But it's not an objective test. It's an objective test. Exactly. So it has to be objectively reasonable. So, therefore, you can have disputed facts. You don't just say the question isn't what did the police officer think. It's what did the police officer reasonably think based on the objective facts. I think the threshold issue is what did the police officer say. And it is a situation where the officer told the plaintiff to remain in the vehicle. We have independent witnesses that corroborate that. We have the officer. Then we have a situation where the plaintiff doesn't say factually he did not tell me to stay in the vehicle. What the plaintiff says is I did not hear him tell me to stay in the vehicle. That is a subtle but important fact in my mind. It actually shows that McPherson isn't making up stories. He's saying I didn't hear him, which is more truthful than saying no in light of the fact that he didn't hear him. He could have said no, but he said I didn't hear. Similarly, he could have said I didn't move my feet, but he said I don't remember. To me, reading that transcript, it seems as though McPherson is the one who's telling the true story. McPherson is my officer, and I would agree with that. I'm sorry, that's wrong. Then I mean the victim. Who's the victim? Brian. Right. There's a confusion. We have Brian McPherson and Carl Brian. I know. I got him confused. Certainly. In analyzing that fact pattern, Your Honor, I think we have to back up. And I think a citizen is obligated to follow any reasonable and lawful command of an officer. And we have a situation, Your Honor, where the officer, and again, it's undisputed, the officer indicated remain in your vehicle. And it's unfortunate, but the fact that... Now, was this, did the officer have a bullhorn? No, sir. No, Your Honor. He did not. There was a distance between the officer and the plaintiff of 15 to 20 feet. We had independent witnesses 50 to 70 feet away who heard the command remain in your vehicle, stay in your vehicle. And it was... Oh, he shouted at them? Yes, Your Honor. We had people playing tennis across the street 50 to 70 feet away. These are the independent declarations before the court. In particular, the Iridium Declaration, R-I-D-I-O-N in English. Let me ask you a couple of questions. Of course, Your Honor. Did this officer have any training in the use of the taser? Yes, Your Honor. What was the training? Your Honor, the police officers go through extensive training with the taser. I'm talking about this officer. Basically, through the academy, you have taser training. Every officer who is employed by the city of Coronado must go through the police academy and receive the requisite training in weapons, including taser. All right. Now, this taser was the X-26, right? That is my understanding. So I've got there literature you can just get out of your computer. It says the X-26 is our premium law enforcement electronic control device. It uses replaceable taser cartridge containing compressed nitrogen propulsion system to deploy two small probes that are attached to the taser X-26 by insulated wires. And then an NMI impulse goes through these wires into the target at distances up to 35 feet. I'm just reading part of this. Now, a taser is capable of killing a person, is it not? I think that would rely on expert opinion, certainly, beyond my understanding. Well, is it adjustable? Can you increase the voltage that goes through? Your Honor, I do not know the answer to that. Again, we have an excessive force expert on this case who would address those issues should this matter proceed to trial. I do not believe, given the prior opinions of the court and the utilization of a taser as standard equipment, that this is deemed a lethal weapon. Certainly, circumstances could arise where someone could hit their head as a result of the deployment of the taser, but I do not believe the weapon is designed to exert or provide lethal force. It is a lesser type weapon. Was there anything you could have done besides use the taser? Your Honor, in other excessive force cases, you're talking about the excessive force expert brought this to mind, where we've actually had trials on it. They've testified as to various levels of force that reasonably should be used before you get to more harmful types of force. What else could this officer have done besides use the taser? Certainly, I could go through the list of the standard weapons that the officers carry. I don't know the answer. It may call for speculation, Your Honor, but he certainly has impact weapons at his disposal. Did he need to use a weapon? I mean, if Nan was in his underwear by his car 15 to 20 feet away, I think that's undisputed, or is that disputed? I think, from our standpoint, the 15 to 20 feet is undisputed, Your Honor. Okay. So what was it that necessitated the taser? What necessitated the taser, and clearly it was not in our moving papers, but I handle a lot of excessive force cases, there is what's called the 21-foot rule. If someone is advancing upon an officer, it takes just less than a second to get to the officer. So he already engaged his taser based upon the conduct of Mr. Bryant. He has to energize the weapon. You've got an irrational behavior, flailing of the fists, clenched fists, the yelling of profanities, noncompliance to orders, just the general demeanor of the plaintiff. So it's already engaged. When he advanced, that's what prompted the use of the taser. The officer, in my opinion, should not have to wait for the suspect or plaintiff in this case to get to that officer and engage him in hand-to-hand combat. I think the officer is looking out for his own well-being. Whether or not he advanced seems to be the issue in dispute. Again, and I cite the court at page 127, lines 3 through 6, he does not recall the uncontroverted declarations of Ingram and the uncontroverted declaration of Riddian and the McPherson deposition all have him advancing. Who is Ingram? Ingram is one of the tennis players who are playing tennis across the street. Riddian is also one of the independent third-party witnesses that indicates he advanced, and then McPherson himself indicated that Mr. Bryant started to advance. After being directly indicated. You said both of them indicated something. Yes, sir. What did they say? They said he started to advance? Yes, they took two to three feet toward, steps toward. The most conclusive facts are out of the Ingram declaration, page 2. Let me just get to the site so there's no guesswork. Ingram, page 2, lines 3 through 4. Riddian declaration, page 2, line 6. Ingram said he took two to three steps toward the officer. That's the reason the motion was filed in the first place. It is our position. You know, can I tell you something? One, what's wrong with a little trial? You can get these things over with a lot more quickly by trial than going through this process here. There are disputed facts. You have a judge down in San Diego that denied your motion for summary judgment. Yes, Your Honor.  Well, absolutely not. Well, why don't you just go to trial? Because my client has the right to bring this issue before this Court on what we perceive to be undisputed facts, no affirmative evidence refuting that Mr. Bryant advanced on our officer in order to streamline the case. Your Ingram declaration says it appeared the driver took at least one or two steps in the direction of the officer. Now, that's not exactly a compelling statement. What does it mean it appeared? It means he doesn't really know it appeared that way. Now, he doesn't say he took steps toward the officer. He says it appeared that he took one or two steps. Now, I don't know what one or two means, but if we're going to construe this in the manner most favorable to the nonmoving party, it's that maybe he took one step. Now, that's hardly advancing on the officer, and that's your strongest declaration, he said. And Ridlon doesn't even – Ridlon just says that – I don't know who drafted the declaration, but it says he bounded out of his car and made an erratic jumping motion. He said nothing about steps. Those are the facts as we understand them. Those are the only facts on the record. Okay, but those are the facts you have. Those are your best facts that appear he took one or two steps, meaning maybe he didn't take any, or maybe he took one step. Now, that's not exactly compelling for summary judgment. All right. I'm not – you know, the facts are what they are, and you're doing your best with them, But I've got to say that's hardly an overwhelming case. You've got a witness who couldn't even say he took several steps, but he can only say that it appeared, which means the appearance may not be what happened. And he says one step. Well, you know, if you put your foot down, you're taking a step. Envision the trial, though, Your Honor. When you put the plaintiff on the stand, obviously he's going to have to take the same position or be impeached. So he's going to say, I don't recall what I did. Then we're going to put the officer on who's going to indicate that he advanced. Well, in that case, you're not going to have to worry about a trial. There's not going to be a problem. And then we have the two independent witnesses with the facts as they are. Okay. And don't worry about winning if that's the case. In our opinion, those facts, it's right for summary judgment. So with that, I would submit, I would ask just for a short time for rebuttal. Thank you. Thank you. All right. May it please the Court. Talk into that one on your right side, would you? Yeah. I will do so, Judge Gregerson. We're supposed to have a speaker over here so we can. I think it may be working today. I don't think it's working yet. Let me try to speak in a loud voice then. Do that. I will do so. Let me first, if I could, talk about the factual issues. First of all, in raising an interlocutory appeal, the appellant, the official, is supposed to present a clear issue of law. And if there is a disputed factual issue, they must assume the facts in the light most favorable to the plaintiff in the case. That has not been done. That's just what I said. I got it right. Thank you. Well, I've read many of the cases, including Diorre, which I believe is dispositive on the issue of the qualified immunity. And I believe a Graham v. Conner analysis, which the district court conducted in this case and which was alluded to, clearly shows that there was a constitutional violation. The three questions under Graham v. Conner, nature of the offense involved. Secondly, is there an immediate threat that's represented by the person who is harmed? And third, is the person in the course of resisting an arrest or trying to flee? Nature of the offense, not wearing a seat belt. Now, I don't mean to speak against the policies of the state of California, which has been defended so well earlier today. But it seems to me that if you were to have a continuum of criminal offenses, infraction not wearing a seat belt is one of the least serious, most innocuous possible offenses of all. Certainly not one important danger to the public. My wife wouldn't agree with you. Well, fortunately, Judge Preggerson, your wife is not on the panel, and I can rely on you to follow the precedent in this regard, I hope. Not to say anything bad about your wife. What do you make of the factual dispute? Opposing counsel says that your client says he doesn't remember whether he took steps in the direction of the officer and that on the other side they have testimony that he did, therefore, there's really no factual dispute. I answer it this way, Judge Reinhart. First of all, a slight lack of memory in the immediate wake of being jolted with 50,000 volts of electricity, I think is a suggestion that he's being truthful and candid in his remarks. All right, truthful and candid, but... There is circumstantial evidence that he was not facing the officer specifically, and the district court judge addressed this specifically and held that there was reasonable evidence from which a jury could find not merely that he was not taking a step toward or going toward the officer, that he wasn't even facing him. Why? He was shot, not... The officer says, well, I shot him as he was advancing on me. He took one step, bang, I shot him. Well, in fact, the barb embedded itself not in his torso but in his left arm, and the inference from the location where the blood on the pavement was, which was washed off and is shown in the photograph, is that he fell not forward toward the officer but in an angle away from the officer. In other words, and given what we know about the nature of the taser, and we also had submitted, Judge Ferguson, with respect to the X26, some of that information, basically once the taser strikes and the 50,000 volts of electricity go through the person's body, they're paralyzed, they're immobilized, they cannot move, which is why the plaintiff in this case froze and then fell face first into the pavement. So he would have fallen in the direction in which he was facing at the time the taser struck him. The location of the blood was not behind the front door but rather to the side and almost to the front of it. In pages two and three of our excerpt of records, we have the photographs which show this. Hold on, you're being asked. I'm looking at it. How far are you away from me? You're within range. Of the taser? I certainly hope you don't have one up there. Within hearing range. Okay, I'm looking at this picture. Is that the car that Brian, Mr. Brian, was driving? It is Judge Wardlaw. And this is where the police car is? That is correct. And so the officer was standing? The testimony was he was standing right by his front door to the side of it. Okay, so you're saying he had to be turned slightly away from the police car to have fallen? Yes, and if you'll look at that next page, you will see that there's a stream of water washing the pavement. That's washing away where he had fallen. His teeth were knocked out and he had bled and there was a puddle of blood. So this was the ambulance that came later? Yes. Okay, and there was someone else in the car with him? Yes, his little brother was in the car with him. What did the brother say? The brother said, I'm quoting from memory, so I hope you'll forgive me, but as I recall, his brother said he just got out. He got out and almost immediately upon opening the door and getting out of the car, he was struck with the taser and fell down. The little brother, in fairness to the other side, however, was still seated and didn't get to see from the perspective that the officer had. But that is what I recall his testimony to have been. Let me, if I could, talk about the other two Grand V Conner factors. The second is, is the person an immediate threat? The District Court judge found, as a matter of fact, that assuming the facts in the light most favorable to the plaintiff, he was not a risk to anyone. In fact, assuming the facts in the light most favorable to the plaintiff, he was facing away from the officer. And other than screaming, he was doing nothing that would constitute a physical threat to anyone. Third and finally, the grand factor is, is the person resisting arrest or is the person in the process of flight from an arrest? And the answer here is clearly no. And the District Court judge so found. So on the factual issues, they have no right to manipulate the facts here and then argue again as though they were arguing to a jury. The District Court judge found, A, minor offense. B, no threat. C, no resistance to arrest or flight from arrest. So was there a constitutional violation? Yes. With respect to the issue of qualified immunity, the Deerley case in this court decided in 2001, four years before the events in this case, included some language in which I think a very brilliant jurist wrote the following. Every police officer should know that it is objectively unreasonable to shoot, even with a lead bean bag, a person who has committed no serious offense, who is mentally or emotionally disturbed, who has been given no previous warning of the imminent use of such a serious degree of force, who poses no threat of flight and who poses no objectively reasonable threat to the safety of the officer or other individuals. And that, to my mind, sets out the rule very clearly that says no officer in this situation would have qualified immunity. Forgive me, Judge Warlock. So what is the evidence regarding whether or not there was a warning? The officer – that is undisputed. There was no warning. The officer, the defendant, McPherson, said, no, I didn't warn him. He stepped, I shot him. Boom. No warning whatsoever. And as to the other question that you pose, Judge Warlock, which is what was the alternative? Well, the alternative, especially if he was facing away and simply screaming, is do nothing. Wait. Stop. And especially when dealing with a mentally ill person, this court, also in a case that is on the qualified immunity issue, the Drummond case, says, well, it's not a black and white rule, but the rule of reason requires that when an officer is dealing with somebody who may be mentally or emotionally upset or disturbed, that that's an entirely different kind of situation, calling for an entirely different calculus of reasoning than dealing with a dangerous felon in the – who is armed and who is in a position where he might be a danger to others. This is an entirely different situation. I'd like to say one other thing, if I could, which is this. And this goes to the issue that was touched upon endearly and dealt with, which is this so-called less than lethal. The Taser company likes to call it nonlethal, but it's less than lethal force. The fact of the matter is there have been more than a hundred deaths in the United States and Canada from Tasers. And that it is true that as a general matter, the Taser does not kill somebody. But there are circumstances, especially in which someone has a weak heart or some physical anomaly, in which the Taser, 50,000 volts of electricity, can kill somebody. And many, many people have died from the use of this so-called less than lethal force. And in that regard, I think that it's important, especially in light of the court's recent – well, several years ago, but our court, which was out of step with the other circuits on the definition of what lethal force is. And now our circuit is in line, which says if it presents a serious risk of death or serious bodily injury. And to my mind, shooting this young kid, 20 years old, in his little green underwear with little men on it, as he gets out of the car, having been stopped for the heinous offense of driving without a seat belt, and shooting from a distance of 20 feet, 50,000 volts of electricity in him, when he's on an uneven and a hard pavement surface so that he's going to face plant when he falls, is patently unreasonable. And so the district court judge clearly had it right. And we, too, I think that a reasonable jury, when they confront all of the circumstances and they understand what a taser is, will conclude the exact opposite of what my colleague says. But in any event, we have a right to go to trial. And I'm asking the Court to affirm the decision of the district court that this case should go to trial. May I thank the Court. Thank you. Yes, immediately. Thank you. Just a couple of points. One, I still don't believe there's a clear precedent on the use of a taser under these circumstances. And as of the date of the incident, raper is the closest thing we have factually. So even if the officer did not act reasonably, I think he's still entitled to qualified immunity under the law. Just to point out a couple of factual and legal issues, this did not arise out of a seat belt violation. He was pulled over for not wearing the seat belt. He failed to follow a lawful order, which is a violation of Penal Code 148A. The facts are much more egregious than my co-counsel indicates. You have that fact pattern in front of you. The last thing I want to point out is two things. One, these taser deaths. I would object. There is no evidence before the Court regarding taser deaths on the record. And two, the passenger in the vehicle, the brother, added nothing on the record in this particular case. So I do think, given the facts that are undisputed, and that is he advanced on the officer, there is no constitutional violation. One, and two, the officer is entitled to qualified immunity. Thank you. Well, thank you. Thank you. And the manual stands submitted. Thank you. Thank you. Thank you.
judges: Pregerson, Reinhardt, Wardlaw